**Affirmed and Opinion filed October 31, 2013.**

**In The**

# Fourteenth Court of Appeals

**NO. 14-12-00532-CV**

**ALIEF INDEPENDENT SCHOOL DISTRICT, DAN TURNER AND HENRY BONAPARTE, Appellants**

**V.**

**TROY PERRY, Appellee**

**On Appeal from the 215th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2006-02596**

## O P I N I O N

In nine issues, appellants Alief Independent School District (AISD), Dan Turner, and Henry Bonaparte challenge the judgment against them in favor of appellee Troy Perry on his whistleblower and First and Fourteenth Amendment claims. We affirm.

### *Factual History*

AISD maintains its own police force. In 2004, AISD hired Perry to join AISD's police force as "gang officer" to address gang-related activity in AISD schools.[1] In mid-2005, Turner, then captain of the police force,[2] allegedly was approached by "more than one" AISD campus principals who expressed concern over "the way [Perry] dealt with students."[3] Appellants assert that these incidents were "part of a pattern of problems caused by Perry's behavior," including allegedly referring to students as "ghetto kids," "escalating situations with students," "acting inappropriately with students," "violating all sorts of [departmental] procedures," and failing to seek permission from a supervisor before contacting the district attorney to bring charges against a student. Appellants allege that Turner and Bonaparte, who was at the time a sergeant acting as Perry's supervisor,[4] had numerous conversations with Perry about these issues. Perry denies the allegations.

Perry alleges that in late 2004, he met with the mayor's anti-gang task force representative, who had heard a rumor of a planned May 5th nationwide gang war that would involve Houston gang members. Perry sent an email to gang

---

[1] Perry previously had been a Harris County deputy sheriff.

[2] By the time of trial, Turner had been promoted to chief of the police force.

[3] One principal was concerned about "the rough temperament that . . . Perry use[d] when he [was] interviewing students or talking to students." Allegedly, Perry was involved in a confrontation with a student and the student's parent, who were both apparently arrested. Turner testified, "Perry intervened with a student and it became confrontational and the student was arrested and, if I'm not mistaken, so was the student['s] parent." Turner did not know the names of the student or parent. Turner could not remember if Perry's actions with regard to this incident were investigated.

Another principal was concerned with "the way that . . . Perry . . . interacts with students" and allegedly asked Turner "to keep him off of her campus." Turner did not know what incident that principal was referring to.

[4] By the time of trial, Bonaparte had been promoted to captain of the police force.

investigators both inside and outside of AISD warning them about this possible event.[5]  Perry asserts that an anti-gang liaison with the Texas Attorney General's Office contacted him in response to the email and asked, "Do you mind if I post this on CLEO?"[6]  According to Perry, "[I]t's obviously in the best interest of law enforcement agencies to have every avenue of information that they could, so I said yes."  Perry asserts that Bonaparte told him "the superintendent had been receiving lots of phone calls [because of the CLEO posting]," "was upset because this information had gotten outside of the district," and "the district was embarrassed."  Bonaparte also told Perry, "in the past[,] previous gang officers had [interacted with the community to address gang problems] and . . . that tended to lower the property values in the area," which AISD did not like.  On May 4, Bonaparte sent Perry a written notice stating he was not to disseminate information regarding "activities in and around this district . . . without prior written approval from [the] departmental supervisor."

On June 13, Perry received an annual performance evaluation indicating his performance "m[et] expectations."  Later that month, after he issued a traffic ticket to an AISD teacher, Bonaparte and Turner removed the ticket from the citation book in Perry's office.[7]  Approximately two weeks later, Turner put Perry on a disciplinary "Growth Plan," which appellants allege was intended to help Perry "identify and improve his performance problems" listed on the plan as "[a]reas of identified weakness," including (1) failing to follow the chain of command; (2) inappropriate attitude and demeanor; (3) failing to follow patrol protocol such

---

[5] Turner and Bonaparte were copied on the email.

[6] CLEO, which stands for "Criminal Law Enforcement Online," is an information-sharing database maintained by the Texas Department of Public Safety.  It is accessible only by law enforcement personnel.

[7] Appellants do not dispute this fact.

as responding to calls and requests for backup; and (4) spending excessive time in the office. At the same time, Perry was demoted from gang officer to patrol officer and lost a weekend day off. Perry asserts during a meeting to discuss the plan, Bonaparte admitted he took the traffic ticket out of Perry's office because the teacher Perry had ticketed was a friend of Turner's and "politically connected."

On July 25, 2005, Perry filed a grievance[8] complaining about his reassignment, alleging it was the result, in part, of his ticketing the teacher. The grievance also states that Bonaparte admitted removing the ticket from Perry's citation book. On September 13, 2005, a hearing on Perry's grievance was held. Bonaparte signed the decision denying relief. Perry filed his Level Two grievance on October 11, 2005. Perry filed a Level Three grievance on November 2, 2005 because neither the superintendent nor his designee met with Perry before the required deadline. No further action was taken on this grievance.

On October 18, 2005, Perry filed a formal complaint with the district attorney reporting the destruction of the traffic ticket by Bonaparte and Turner. Perry alleges he hand-delivered a new Level Two grievance to the AISD's

---

[8] AISD has a four-step process for an employee to pursue a grievance:

1. The employee and his immediate supervisor meet for an informal conference.

2. If the employee is dissatisfied, he may "file" a Level One grievance with his supervisor. A Level One conference is then held between the "appropriate administrator" and the employee, after which the administrator must provide the employee with a written response.

3. The employee may appeal the response by filing a Level Two grievance. The superintendent then must conduct a conference with the employee and subsequently provide a written response to the Level Two grievance.

4. The employee may appeal by filing a Level Three grievance, which is submitted to the Board of Trustees. Then, the Board determines whether the grievance merits a hearing. If so, the Board may make its determination orally or in writing. The lack of a response by the Board by the end of its next meeting upholds the Level Two decision.

superintendent's office on October 27, 2005, with the heading "Level II grievance Retaliation/Whistleblower." The grievance states,

> Due to the recent grievance filed by Officer Perry, reference [sic] inappropriate disciplinary action and illegal conduct by Sergeant Bonaparte and Captain Turner, ***which was also reported to the Harris County District Attorney's Office***, Officer Perry can only conclude that the letter of reprimand, arbitrarily enforcing an unwritten practice, is intended to intimidate him and act as a smokescreen to cover up their inappropriate and illegal behavior.

(Emphasis added.).[9]

Perry also asserts he personally delivered a letter to Bonaparte on November 1 that states:

> The fact that you brought up . . . two [more] issues [timely reports and overtime], only after I had submitted my request for clarification and guidance, reflects continued efforts to create a smokescreen and to retaliate against me ***for bringing the illegal and unethical actions of yourself and Captain Turner to the attention of the administration and the District Attorney***.

(Emphasis added.)[10]

The same day, Turner sent a memorandum to AISD's Assistant

---

[9] Perry had received the letter of reprimand referenced in the Level Two grievance in late September. On September 21, 2005, every patrol unit was called to assist with an incident at Elsik High School referred to as a "near riot." Perry responded and arrested a female student. He and other officers took the student and several others to the police station. Perry contacted the district attorney to file charges against the student for resisting arrest. Perry received the written reprimand one week later for violating an AISD procedure by contacting the district attorney to file charges against a student without seeking authorization from a supervisor. Perry alleges AISD had not previously required him to seek such authorization. AISD relied on a 1998 memorandum stating that officers are required to obtain authorization before contacting the district attorney to file charges. AISD alleges the memorandum was shown to Perry when he was hired.

[10] The letter states that Perry previously had requested guidance on processing a warrant for a juvenile offender and Bonaparte responded with complaints about Perry's timely processing of reports and putting in overtime work hours to file charges.

Superintendent for Human Resources, Dr. Rose Benitez, referencing a "response" from Perry and complaining that it took three requests before Perry complied with Bonaparte's directive for a written response regarding a "case incident." Perry alleges the "response" mentioned in the memorandum could only be the Level Two grievance, which references his report of "illegal conduct" by Bonaparte and Turner to the district attorney.

Perry asserts that, on November 11, at approximately 12:30 p.m., he hand-delivered to the superintendent's secretary a copy of a Level Three grievance. The Level Three grievance states, "The Superintendent, or his designee, failed to meet with grievant [with regard to his Level Two grievance] within 10 days. This is a retaliation/whistleblower grievance."[11] That afternoon, Benitez and Bonaparte met with Perry and terminated his employment.

Benitez testified at trial that she made the final decision to terminate Perry based on Turner and Bonaparte's recommendation; however, in her deposition testimony presented at trial, she said the decision to terminate Perry was a joint decision among Benitez, Turner, and Bonaparte.[12] Benitez also asserted at trial

---

[11] On November 2, Perry had filed a Level Three grievance with the Board.

[12] The deposition testimony presented at trial follows:

> [Benitez:] I met with Dan Turner and Henry Bonaparte and counsel was with us and we reviewed the information they had sent over from the police department. And basically, the question from me to them was what is it that ya'll want to do? Do you want to suspend, do you want—as far as the disciplinary action. You know, there is a whole range from suspension to docking a couple day's pay, more days [sic] pay, what was it that they were seeking and was that an action that we could support. So we had a discussion about it. And at the end, the decision was made between the three of us with counsel with us that they wanted to terminate.
>
> [Perry's counsel:] And is it your testimony that the decision to terminate Mr. Perry was a joint decision by everybody at the meeting?
>
> [Benitez:] That's correct.
>
> [Perry's counsel:] Okay. It wasn't just your decision?

that she was not aware that Perry had filed a grievance or provided letters "to any person, that [she was] aware of at [AISD] that said he had made a report of illegal conduct to the Harris County DA's office before [she] made a decision to terminate him." Perry alleges that he told Benitez at the termination meeting that he "believed [he was] being retaliated against for being a whistleblower."[13] Perry also asserts that Benitez pulled out the October 27 "whistleblower retaliation grievance" at the meeting, which Benitez denied (she testified she was looking at an earlier grievance filed by Perry).

On November 17, Benitez sent Perry a letter identifying the "issues surrounding his job performance" as (1) failing to follow departmental procedures; (2) inappropriate interaction with students; (3) failing to respond to officer/dispatch calls; and (4) conduct detrimental to the Alief police force. Turner testified he first learned that Perry had reported him to the district attorney on November 30. Bonaparte did not testify at trial, as discussed more fully below.

### *Procedural History*

Perry filed suit against AISD on January 13, 2006, seeking an injunction and monetary damages. Perry subsequently added Turner and Bonaparte as defendants and asserted claims, among others, for violations of the Texas Whistleblower Act[14] and his rights under the First and Fourteenth Amendments of the United States Constitution. Meanwhile, the district attorney indicted Turner for giving a false

---

[Benitez:] Right. That's correct.

[13] Perry testified,

> I kind of laid out the case that I had been told I had exemplary performance . . . . That I hadn't done anything. And that it was only after I had began [sic] filing grievances and . . . had made the report to the District Attorney's office that now these things were coming up and that I was being persecuted.

[14] Tex. Gov't Code §§ 554.001-010.

report to a peace officer. Turner subsequently was acquitted. Perry sought to depose Turner and Bonaparte, but they invoked their Fifth Amendment privileges against self-incrimination.[15] Perry deposed Turner after his acquittal but never deposed Bonaparte. Appellants filed a motion for summary judgment in November 2007, based in part on Turner's and Bonaparte's assertion of qualified and official immunity, which the trial court denied. On interlocutory appeal, this court dismissed Perry's First Amendment claims arising out of the posting on the CLEO website, but otherwise upheld the trial court's denial of Turner's and Bonaparte's assertions of immunity.[16]

After a pretrial hearing, the trial court excluded Bonaparte's testimony based upon his prior assertion of the Fifth Amendment privilege against self-incrimination. The jury returned a verdict against AISD on the whistleblower and Fourteenth Amendment claims and for AISD on the First Amendment claim. The jury found against Turner and Bonaparte on the First and Fourteenth Amendment claims. The jury awarded Perry $62,500 in lost wages and $325,000 in mental anguish damages. The trial court entered judgment on the whistleblower and First Amendment claims and, alternatively, on the Fourteenth Amendment claims and awarded Perry $468,445 in attorney's fees.

### *Discussion*

In six issues, appellants challenge the legal sufficiency of the evidence in support of Perry's whistleblower and First Amendment claims and complain of the trial court's preventing Bonaparte from testifying in his defense, allowing Perry to

---

[15] Perry's counsel noticed and took Bonaparte's deposition twice, but both times Bonaparte claimed the Fifth Amendment privilege and indicated he would not answer any questions.

[16] *Turner v. Perry*, 278 S.W.3d 806, 825-26 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

recover for the same injury against multiple defendants for more than one claim, and failing to require Perry to segregate his attorneys' fees. In three alternative issues, appellants complain of the trial court's entry of an alternative judgment in favor of Perry on his Fourteenth Amendment claims.[17] We conclude that the evidence in support of Perry's whistleblower and First Amendment claims is legally sufficient. Accordingly, we do not reach appellants' issues involving the alternative judgment in favor of Perry on his Fourteenth Amendment claims. We further conclude the trial court did not abuse its discretion in preventing Bonaparte from testifying, the trial court did not erroneously allow Perry to recover the same amount against appellants for multiple claims, and Perry's attorney's fees were properly segregated. We affirm.

## I. Legal Sufficiency Challenges

In their first through third issues, appellants challenge the legal sufficiency of the evidence in support of Perry's whistleblower and First Amendment claims. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In reviewing the evidence for legal sufficiency, we must credit favorable evidence if reasonable factfinders could have done so and disregard contrary evidence unless reasonable factfinders could not have done so. *Id*. "If the evidence . . . would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so." *Id*. at 822. "A reviewing court cannot substitute its

[17] Perry elected to recover on his whistleblower claim against AISD and First Amendment claim against Bonaparte and Turner, but reserved his right to a judgment in the alternative against appellants on his Fourteenth Amendment claim. Appellants complain of the trial court's entry of alternative judgment on Perry's Fourteenth Amendment claim and submission of an erroneous Fourteenth Amendment liability interrogatory and a broad form damages interrogatory in the court's charge.

judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *Id*. Although the reviewing court must consider evidence in the light most favorable to the verdict and indulge every reasonable inference that would support the verdict, if the evidence allows only one inference, neither factfinder nor the reviewing court may disregard the inference. *Id*. We measure the sufficiency of the evidence according to the charge submitted to the jury. *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 221 (Tex. 2005); *Bishop v. Miller*, Nos. 14-12-00264-CV, 14-12-00318-CV, 2013 WL 4857891, at *4 (Tex. App.—Houston [14th Dist.] Sept. 12, 2013, no. pet. h.).

### A. Whistleblower Claim

In their first issue, appellants argue that Perry failed to present legally sufficient evidence of the causation element of his whistleblower claim because he did not show that Benitez knew, before making her decision to terminate Perry, that Perry reported the destruction of the traffic ticket to the district attorney. The Texas Whistleblower Act provides, "A state or local governmental entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority." Tex. Gov't Code § 554.002(a). Beyond satisfying each element of the statute, a whistleblower plaintiff must also produce evidence that his report of a legal violation caused the adverse personnel action. *See City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 67 (Tex. 2000). While circumstantial evidence may be sufficient to establish a causal link between the adverse employment action and the reporting of illegal conduct, such evidence must, at a minimum, show that the person who took the adverse employment action knew of the employee's report of illegal conduct. *Harris Cnty. v. Vernagallo*, 181 S.W.3d 17, 25 (Tex. App.—

Houston [14th Dist.] 2005, pet. denied). Obviously, a decision-maker could not fire an employee because of the employee's report of alleged illegal conduct if the decision-maker did not even know the employee made such a report.[18] *Id*.

**Final Decision-Makers**. As an initial matter, we must decide who made the decision to terminate Perry. Appellants argue it was Benitez alone because Bonaparte and Turner did not have the final authority to do so. *See id*. (acknowledging person who had "authority to hire and fire without consulting any other person or board" was decision-maker for purposes of whistleblower claim). Benitez testified that she was the final decision-maker on the matter and made her decision based on Turner and Bonaparte's recommendation. However, during her deposition, Benitez testified that she, Turner, and Bonaparte made the decision together.[19] We conclude this is some evidence that Turner and Bonaparte participated in the decision to terminate Perry. Thus, the jury reasonably could have concluded that Benitez, Turner, and Bonaparte were all "decision-makers" for purposes of Perry's whistleblower claim. *See, e.g., Johnson v. Louisiana*, 369 F.3d 826, 831 (5th Cir. 2004) (noting, with regard to federal First Amendment retaliation employment discrimination claims, only "final decision-makers" may be

[18] The jury was asked in the court's charge, "Was Troy Perry's report to the Harris County District Attorney's Office that Dan Turner and Henry Bonaparte destroyed a traffic ticket made in good faith and a cause of AISD terminating Troy Perry's employment when AISD terminated Troy Perry's employment?" Thus, our review is limited to whether the evidence is legally sufficient to support an inference that Benitez, Turner, and Bonaparte knew about the report to the district attorney of the destruction of the traffic ticket. *See Romero*, 166 S.W.3d at 221; *see also Bishop*, 2013 WL 4857891, at *4.

[19] The following deposition testimony was presented at trial:

[Perry's counsel:] And is it your testimony that the decision to terminate Mr. Perry was a joint decision by everybody at the meeting?

[Benitez:] That's correct.

[Perry's counsel:] Okay. It wasn't just your decision?

[Benitez:] Right. That's correct.

liable, but acknowledging multiple persons could conspire together to make an adverse employment decision). We next consider whether the evidence supports a reasonable inference that any of these decision-makers knew of Perry's report to the district attorney before Perry was terminated.

**Knowledge of Report to District Attorney**. Perry argues the chain of events presented at trial supports the jury's finding that Benitez, Turner, and Bonaparte all knew Perry reported the destruction of the ticket to the district attorney. We agree that the following evidence supports the jury's finding:

- On July 15, during the meeting regarding Perry's demotion, Bonaparte and Perry discussed the destruction of the traffic ticket.
- On July 25, Perry filed a Level One grievance specifically referencing the destruction of the ticket by Turner and Bonaparte.[20]
- A hearing was held to address the grievance on September 13, with Benitez present, so the jury reasonably could infer that Benitez would have known about Perry's allegation with regard to the destruction of the traffic ticket.
- Perry reported the destruction of the ticket to the district attorney on October 18.
- Perry filed his Level Two grievance on October 27, which references his earlier Level One grievance and "***illegal conduct*** by Sergeant Bonaparte and Captain Turner, ***which was also reported to the Harris***

[20] That grievance states:

> Bonaparte said, "You had two complaints against you in a short period of time [both regarding Perry's issuance of traffic tickets on Bear Ram Drive, and specifically the incident when he ticketed a teacher] . . [and] . . [the teacher] . . is politically connected . . she's a friend of the Capt. . . her daughter and the Capt's daughter are on the same volleyball team. Perry then asked, "So that's why the ticket is missing out of my ticket book." Sgt. Bonaparte then said, "Yeah." Officer Perry then said, that is inappropriate. [the Capt.] should have come talk to me." Sgt. Bonaparte then said, "I understand; you're right."

(Alterations including brackets and ellipses transcribed as in original.)

***County District Attorney[']s Office***." (Emphasis added.) Reviewing the two grievances in conjunction supports a reasonable inference that the "illegal conduct" in the Level Two grievance referred to the destruction of the traffic ticket specifically referenced in the Level One grievance.

- Perry testified he handed Bonaparte a letter on November 1, in which he alleged that Bonaparte engaged in "continued efforts to . . . retaliate against me for bringing the illegal . . . actions of yourself and Captain Turner to the attention of the administration and the District Attorney." The same day, Turner sent a memorandum to Benitez referencing a written response from Perry to a reprimand. Perry testified the only "response" he submitted was the November 1 letter. Thus, the jury reasonably could have inferred that Turner had seen the letter.

- Perry testified Benitez had a copy of the October 27 Level Two grievance at the termination meeting, which specifically referenced "illegal conduct" by Bonaparte and Turner that Perry had reported to the district attorney.

Based on the foregoing evidence, we conclude the jury reasonably could have inferred that Benitez, Turner, and Bonaparte all knew Perry had reported the destruction of the traffic ticket to the district attorney before making the decision to terminate him.[21] Accordingly, legally sufficient evidence supports the causation element of appellants' whistleblower claim.[22]

[21] Appellants cite *Vernagallo* in support of their argument that an employee may not show he was terminated for a protected activity without showing the final decision-maker knew of that activity. 181 S.W.3d at 25-27. In that case, Vernagallo was terminated from his job after he reported illegal conduct to the district attorney by anonymous letter and subsequently in person. *Id*. at 21. Although Vernagallo's employer knew about the anonymous letter, the record did not show he knew who wrote the letter or about Vernagallo's in person report to the district attorney. *Id*. at 22, 27. Here, Perry presented evidence that (1) Turner and Bonaparte illegally destroyed the ticket; (2) Benitez, Turner, and Bonaparte jointly decided to terminate Perry and before Perry's termination, Benitez knew about the destruction of the ticket; and (3) all three of them knew about Perry's report of "illegal conduct" by Bonaparte and Turner to the district attorney.

[22] Appellants argue to establish causation through circumstantial evidence, Perry was

We overrule appellants' first issue.

### B. First Amendment Claim

In their second and third issues, appellants argue Perry did not present legally sufficient evidence of causation on his First Amendment claims against Turner and Bonaparte because he did not show either was a final decision-maker with regard to Perry's termination or that either knew of Perry's report of the destruction of the traffic ticket to the district attorney until after Perry's termination.

First Amendment retaliation employment discrimination claims are authorized under 42 U.S.C. section 1983.[23] To prove a claim under section 1983, a plaintiff must show a violation of a right secured by the Constitution or laws of the United States and demonstrate that the alleged deprivation was committed by a person acting under color of state law. *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008). A plaintiff must establish that the defendant was either personally involved in the deprivation or that his wrongful actions were causally connected to the deprivation. *Id*. A supervisor is not personally liable for his subordinate's actions in which he had no involvement. *Id*. Only final decision-

---

required to present evidence of *all* of the following under *Vernagallo*: knowledge of the report of illegal conduct, expression of a negative attitude toward the employee's report of the illegal conduct, failure to adhere to established company policies regarding employment decisions, discriminatory treatment in comparison to similarly situated employees, and evidence that the stated reason for the adverse employment action is false. *See* 181 S.W.3d at 25. Setting aside the fact that Perry did not rely solely on circumstantial evidence to prove causation and that he presented evidence of several of the things listed, AISD goes too far: *Vernagallo* merely holds that circumstantial evidence may include evidence of the things listed; it does not hold a plaintiff must present evidence of all of them. *See id.*

[23] Claims under section 1983 may be brought against persons in their individual or official capacities or against a governmental entity. *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009). Perry brought his section 1983 claim against Turner and Bonaparte in their individual capacities.

makers may be held personally liable. *Johnson*, 369 F.3d at 831.

**Final Decision-Makers**. As we have concluded, the jury reasonably could have inferred that Benitez, Turner, and Bonaparte were joint decision-makers. *See id*. Appellants presented evidence at trial that only the superintendent or superintendent's designee has the authority to fire an AISD employee. Benitez testified she was the superintendent's designee for the purposes of terminating Perry and she was the final decision-maker in that regard. However, Benitez also admitted "the decision to terminate . . . Perry was a joint decision" among her, Turner, and Bonaparte. Moreover, Benitez conceded that Turner and Bonaparte participated in the decision to terminate Perry. *See James*, 535 F.3d at 373-75 (upholding dismissal of section 1983 claim against individual defendants when plaintiff did not present evidence that they "participated in the decision to terminate his employment"); *see also Jones v. City of Port Arthur*, No. 1:12-CV-287, 2012 WL 6853909, at *10-11 (E.D. Tex. Dec. 5, 2012) (holding plaintiff had sufficiently pleaded section 1983 claim against four defendants who were not all supervisors but jointly took adverse employment actions against plaintiff who was ultimately terminated), *report and recommendation adopted*, No. 1:12-CV-287, 2013 WL 149706 (E.D. Tex. Jan. 11, 2013). We conclude that the jury was entitled to infer that Benitez, Turner, and Bonaparte were all final decision-makers for purposes of terminating Perry.

**Knowledge of Report to District Attorney**. Appellants argue that Turner was not involved in Perry's grievances, did not know about them, and did not know about the report to the district attorney until November 30, over two weeks after Perry's termination. However, as discussed above, Perry presented uncontroverted evidence that Bonaparte and Turner destroyed the traffic ticket. Also, Perry gave Bonaparte a letter on November 1, which included a reference to

Perry bringing "the illegal . . . actions of yourself and Captain Turner to the attention of the administration and the District Attorney." Appellants assert that there is no evidence Turner saw the letter or knew it existed before Perry's termination on November 11. However, on November 1, Turner sent a memorandum to Benitez referencing a written response from Perry. Perry testified the only "response" he submitted was the November 1 letter. We conclude the jury reasonably could have inferred from this evidence that Turner knew no later than November 1 that Perry had reported the destruction of the traffic ticket to the district attorney.

Appellants similarly argue that Perry did not present evidence that Bonaparte knew about Perry's report to the district attorney. However, as set forth above, Perry presented evidence that he and Bonaparte discussed the destruction of the ticket on July 15 and Perry gave Bonaparte the November 1 letter stating he reported Bonaparte and Turner's "illegal actions" to the district attorney. Appellants argue there is no evidence Bonaparte actually read the letter Perry purportedly personally delivered to Bonaparte. It would be reasonable for the jury to infer that Bonaparte read a letter addressed and personally delivered to him, especially in light of the fact that Perry presented evidence that Turner referred to the letter in the memorandum he sent to Benitez the same day Perry gave the letter to Bonaparte. The jury reasonably could have inferred that Bonaparte would have read the letter before providing it to Turner.

We overrule appellants' second and third issues.

## II.     Exclusion of Bonaparte's Testimony

In their seventh issue, appellants argue the trial court abused its discretion in

preventing Bonaparte from testifying in his own defense at trial.[24] Perry took Bonaparte's deposition twice at a time when Bonaparte could be subjected to criminal prosecution.[25] During both depositions, Bonaparte asserted the privilege against incriminating himself under the Fifth Amendment of the United States Constitution and refused to answer any questions.[26] Appellants provided their witness list eight days before trial, indicating for the first time that Bonaparte intended to testify at trial, but the trial court granted Perry's motion to exclude Bonaparte's testimony. Appellants argue the effect of the trial court excluding Bonaparte's testimony was an unauthorized sanction and Perry did not properly challenge Bonaparte's assertion of the privilege by obtaining an order on his motions to compel Bonaparte's testimony.[27] Perry argues Bonaparte could not use the Fifth Amendment as a shield in discovery and a sword at trial, which would result in "trial by ambush." Perry further argues a party must withdraw in a timely

---

[24] We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012); *Kappel v. State*, 402 S.W.3d 490, 494 (Tex. App.—Houston [14th Dist.] 2013, no pet.). As long as the court's ruling is within the zone of reasonable disagreement, we will not disturb that ruling. *Tienda*, 358 S.W.3d at 638; *Kappel*, 402 S.W.3d at 494.

[25] Appellants concede the crime Perry reported was destruction of a government record, which carries a three year statute of limitations. *See* Tex. Penal Code § 37.10(a)(1), (c)(2); Tex. Code Crim. Proc. art. 12.01(7). Bonaparte was never indicted, but Turner was indicted and prosecuted for giving a false report, which carries a two year statute of limitations. *See* Tex. Penal Code § 37.08; Tex. Code Crim. Proc. art. 12.02. By the time of trial, the statutes of limitation had run for both crimes.

[26] The record on appeal does not include deposition transcripts; however, at a hearing on Perry's motion to exclude Bonaparte's testimony, Perry's counsel informed the trial court:

> [O]n two occasions in past years I noticed and took the deposition of Mr. Bonaparte. And on both occasions, he claimed the Fifth Amendment privilege and indicated that with regard to all questions tendered to him or asked of him he would claim—related to Mr. Perry in this case, he would claim the Fifth Amendment privilege on each and every one of them.

Appellants do not dispute this version of events.

[27] Perry apparently filed two motions to compel that the trial court did not rule on. The motions to compel are not part of our record on appeal.

manner his assertion of the Fifth Amendment privilege to be entitled to testify at trial. We agree with Perry.

The Fifth Amendment guarantees that a person may not be compelled to testify or give evidence against himself. *See* U.S. Const. amend. V; *Maness v. Meyers*, 419 U.S. 449, 461 (1975); *In re Ferguson*, No. 01-12-00607-CV, 2013 WL 941802, at *2 (Tex. App.—Houston [1st Dist.] Mar. 12, 2013, no pet.). The Fifth Amendment can be asserted in civil cases "'wherever the answer might tend to subject to criminal responsibility [he] who gives it.'" *Tex. Dept. of Pub. Safety Officers Ass'n v. Denton*, 897 S.W.2d 757, 760 (Tex. 1995) (quoting *McCarthy v. Arndstein*, 266 U.S. 34, 40 (1924)).[28] Thus, it may be asserted to avoid general civil discovery if the person invoking it reasonably fears the answer would tend to incriminate him. *Id.*; *Ferguson*, 2013 WL 941802, at *2.

The Supreme Court has cautioned that the United States Constitution limits "'the imposition of any sanction which makes assertion of the Fifth Amendment privilege 'costly.''" *Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 547 (5th Cir. 2012) (quoting *Spevack v. Klein*, 385 U.S. 511, 515 (1967)). "Given this consideration—and because all parties should have a reasonable opportunity to litigate a civil case fully—courts should seek out ways to permit as much testimony as possible to be presented in the civil litigation, despite the assertion of the privilege." *Id*. (internal quotations omitted). However, courts must measure

[28] The holding in *Denton* deals with the offensive use doctrine, which applies when a *plaintiff* asserts the privilege to protect information that is also essential to the defense. 897 S.W.2d at 760. The offensive use doctrine allows the trial court to prohibit the plaintiff from introducing evidence on the subject if certain elements are met, because a plaintiff who is seeking affirmative relief should not be permitted to maintain an action, and, at the same time, maintain evidentiary privileges that protect from discovery outcome determinative information not otherwise available to the defendant. *Id.* at 760-61. Here, Bonaparte asserted the privilege as a *defendant* and then sought to withdraw it, so the offensive use doctrine does not apply. In our analysis, we turn to federal authority regarding when a defendant may withdraw the privilege, due to the lack of Texas case law on the subject.

"the relative weights of the parties' competing interests [posed by an invocation of the Fifth Amendment] with a view toward accommodating those interests, if possible." *Id*. Accordingly, courts weigh the specific facts of each case in which a civil litigant has attempted to withdraw his invocation of the Fifth Amendment privilege. *Id*.

Generally, courts should allow withdrawal of the privilege if the opposing parties will not suffer undue prejudice from the litigant's earlier decision to invoke the Fifth Amendment. *Id*. Conversely, withdrawal is not permitted if the litigant is trying to abuse, manipulate or gain an unfair strategic advantage over opposing parties. *Id*. The timing and circumstances under which a litigant withdraws the privilege are relevant factors in considering whether a litigant is attempting to abuse or gain some unfair advantage because withdrawing the Fifth Amendment privilege at a late stage places the opposing party at a significant disadvantage from increased costs, delays, and the need for a new investigation. *Id*. at 547-48.

Bonaparte asserted his Fifth Amendment privilege twice during the discovery period and did not seek to withdraw it until eight days before trial. In withdrawing the privilege at such a late stage, Bonaparte withheld information that Perry could have used in his investigation, only to provide information at the last moment, leaving Perry at a disadvantage. *See id*. at 549 (holding defendant's withdrawal of Fifth Amendment privilege five days before end of discovery period would put plaintiff at a disadvantage by leaving him less than a week to depose defendant and conduct investigation). Given Bonaparte's eleventh-hour withdrawal of the privilege long after the discovery period had closed, we are satisfied that the trial court did not abuse its discretion in preventing Bonaparte from testifying at trial. *See id*.

Appellants nonetheless argue that Perry was required to file a motion to

compel Bonaparte's testimony and obtain a ruling from the trial court to challenge Bonaparte's assertion of the privilege. Perry, however, did not challenge the *assertion* of the privilege; rather, he challenged Bonaparte's *withdrawal* of the privilege. Thus, the authority Bonaparte cites to support his argument that Perry was required to challenge Bonaparte's assertion of the privilege by filing a motion to compel and obtaining a ruling is inapposite.[29] Instead, Bonaparte was required to timely amend or supplement his deposition testimony before he could testify at trial as to any information withheld under his claim of privilege. *See* Tex. R. Civ. P. 193.4(c) ("A party may not use—at any hearing or trial—material or information withheld from discovery under a claim of privilege . . . without timely amending or supplementing the party's response to that discovery."), 193.5 (requiring party to supplement incomplete or incorrect discovery responses). We conclude Perry was not required to file a motion to compel to challenge Bonaparte's withdrawal of the privilege.

We overrule appellants' seventh issue.

## III. One Satisfaction Rule

In their eighth issue, appellants argue the trial court abused its discretion by

---

[29] *See Webb v. Maldonado*, 331 S.W.3d 879, 884 (Tex. App.—Dallas 2011, pet. denied) (refusing to consider on appeal from grant of no-evidence motion for summary judgment whether privilege was properly invoked when nonmovants had not "filed a motion to compel or otherwise sought the assistance of the trial court to resolve the discovery impasse caused by [movant] asserting his Fifth Amendment right against self-incrimination in response to every deposition question"); *In re Garza*, No. 13-07-401-CV, 2007 WL 2246779, at *2-3 (Tex. App.—Corpus Christi Aug. 6, 2007, no pet.) (mem. op.) (acknowledging before a party may be compelled to respond to discovery over an assertion of the Fifth Amendment privilege, the trial court must review the discovery request, apply the law of privilege, discovery and protection to the request, and determine how best to protect the privilege, the right to proceed with the case, and the right to defend the suit); *Marshall v. Ryder Sys., Inc.*, 928 S.W.2d 190, 196 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (noting, to avoid sanctioning party who has offensively used privilege, trial court may look at questions asked in discovery to determine "whether a more narrow inquiry could serve the defendant's discovery needs and allow the plaintiff to avoid . . . self-incrimination").

failing to require Perry to elect his remedies between his whistleblower and First Amendment claims in violation of the one satisfaction rule. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 303 (Tex. 2006). Perry argues the final judgment complies with the one satisfaction rule because it imposes joint and several liability for Perry's single, indivisible injury.

The one satisfaction rule applies to prevent a plaintiff from obtaining more than one recovery for the same injury. *Id.*; *Christus Health v. Dorriety*, 345 S.W.3d 104, 114 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). The rule applies when multiple defendants commit the same act as well as when defendants commit technically different acts that result in a single injury. *Christus Health*, 345 S.W.3d at 114. If a party receives favorable findings on two or more theories of recovery that are consistent with each other and result in the same damages, then the trial court may render judgment awarding a single recovery of these damages, and the judgment may be based on all of these theories. *Hatfield v. Solomon*, 316 S.W.3d 50, 59 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

Here, the trial court entered a final judgment imposing a single recovery of damages holding appellants jointly and severally liable up to the amount of AISD's capped damages.[30] Turner and Bonaparte also are jointly and severally liable under the final judgment for the difference between the capped and non-capped amounts. Because the damages recoverable under the whistleblower and First Amendment claims are identical (but for the statutorily capped amount as to AISD) and because the trial court awarded a single recovery of damages, Perry was not required to elect between these theories of recovery. *See id*. Moreover, the imposition of joint and several liability avoids the possibility of a double recovery.

[30] The final judgment awards Perry $62,500 in lost wages, $325,000 in mental anguish damages, capped at $250,000 for AISD under Texas Government Code section 554.003(c)(4), pre- and post-judgment interest, attorneys' fees, and costs of court.

*See, e.g.*, *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390-92 (Tex. 2000) (holding when defendants commit technically different acts that cause a single injury, nonsettling defendants may claim settlement credit based on damages for which all tortfeasors are jointly and severally liable to avoid double recovery); *Direct Value, L.L.C. v. Stock Bldg. Supply, L.L.C.*, 388 S.W.3d 386, 394-95 (Tex. App.—Amarillo 2012, no pet.) ("[T]he trial court's joint and several judgment [against two defendants on two theories of liability] is proper because it does not permit more than one recovery for [the plaintiff's] single injury."); *Spillman v. Self-Serv Fixture Co.*, 693 S.W.2d 656, 658 (Tex. App.—Dallas 1985, writ ref'd n.r.e.) (acknowledging failure to impose joint and several liability on multiple defendants for single injury permits potential double recovery).

We overrule appellants' eighth issue.

## IV. Segregation of Attorneys' Fees

In their ninth issue, appellants argue the trial court erred in failing to require Perry to segregate his attorneys' fees by theory of liability because AISD cannot be held liable under section 1983 for the conduct of Bonaparte and Turner and Bonaparte and Turner cannot be held liable under the Whistleblower Act.[31] *See Eugene v. Alief Indep. Sch. Dist.*, 65 F.3d 1299, 1304 (5th Cir. 1995) (noting AISD cannot be held vicariously liable under section 1983 for the actions of its employees); *see also* Tex. Gov't Code § 554.002(a) (applicable to state or local government entity). Perry argues that he properly segregated his fees by applying an appropriate percentage reduction under the standard enunciated by the Texas Supreme Court in *Chapa*, 212 S.W.3d at 314.

[31] Perry was entitled to an award of attorneys' fees against AISD on his whistleblower claim, *see* Texas Government Code section 554.003(a)(4), and against Bonaparte and Turner on his section 1983 claim, *see* 42 U.S.C. section 1988.

Generally, a party seeking attorney's fees must segregate those fees incurred in connection with a claim that allows their recovery from fees incurred in connection with claims for which no such recovery is allowed. *Westergren v. Nat'l Prop. Holdings, L.P.*, Nos. 14-11-00058-CV, 14-11-00229-CV, 2013 WL 4857689, at *20 (Tex. App.—Houston [14th Dist.] June 28, 2013, pet. filed). Texas courts recognize an exception to this general rule. *Chapa*, 212 S.W.3d at 311; *Westergren*, 2013 WL 4857689, at *20. When discrete legal services advance both recoverable and unrecoverable claims, attorneys are not required to segregate fees to recover the total amount covering all claims. *Chapa*, 212 S.W.3d at 313-14; *Westergren*, 2013 WL 4857689, at *20. In this situation, the claims are said to be "intertwined," and the mere fact that attorneys' fees are incurred in advancing both recoverable and unrecoverable claims does not render those fees unrecoverable. *Chapa*, 212 S.W.3d at 313–14; *Westergren*, 2013 WL 4857689, at *20. But if any attorney's fees relate solely to a claim for which fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees. *Chapa*, 212 S.W.3d at 313; *Westergren*, 2013 WL 4857689, at *20.

Attorneys are not required to keep separate records documenting the exact amount of time working on one recoverable claim versus an unrecoverable claim. *See Chapa*, 212 S.W.3d at 314; *Citizens Nat'l Bank of Tex. v. NXS Const., Inc.*, 387 S.W.3d 74, 87 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Rather, segregation is sufficiently established if, for example, an attorney testifies that a given percentage of the drafting time would have been necessary even if the claim for which attorney's fees are unrecoverable had not been asserted.[32] *Chapa*, 212

[32] *See Chapa*, 212 S.W.3d at 314 & n.83 (citing *Stewart Title Guar. Co. v. Aiello*, 941 S.W.2d 68, 73 (Tex. 1997) (noting that claimant's attorney "testified that approximately twenty percent of his time and fifteen- percent of his paralegal's time concerned issues predating the agreed judgment"), and *Med. Specialist Group, P.A. v. Radiology Assocs., L.L.P.*, 171 S.W.3d 727, 738 (Tex. App.—Corpus Christi 2005, pet. denied) ("In his affidavit, Radiology Associates'

S.W.3d at 314; *Citizens Nat'l Bank*, 387 S.W.3d at 87.

Appellants argue Perry did not properly segregate fees among claims attributable to each party. Perry submitted redacted invoices of his attorneys in support of his motion for attorneys' fees, along with an affidavit of his attorney James L. Reed. Reed attested that he reduced the reasonable and necessary attorneys' fees Perry incurred in prosecuting his claims by ten percent to segregate out claims for which attorneys' fees were not recoverable. Perry sought $520,498.53 in attorneys' fees, before applying a multiplier.[33]

Reed further attested:

> With regard to all of the claims asserted in this lawsuit, both the claims that were non-suited and the claims that were tried, the underlying facts which would have supported the liability claims and damages were the same. More particularly, all of the claims asserted related to the fact that the Defendants retaliated against Plaintiff, deprived Plaintiff of fundamental rights guaranteed by AISD policy and Texas law, and damaged his reputation, causing mental anguish. All of the discovery that was taken in the case would have been equally applicable to the claims that were non-suited prior to the trial and the claims that were tried to the jury. All of the claims that were tried to the jury are claims for which attorneys' fees can be recovered.
>
> . . . .
>
> [I]t is my opinion that less than 10% of the attorneys' fee time spent in this case relates solely to the claims that were non-suited prior to trial. In the abundance of caution, and to put forth a conservative segregation claim, I have subtracted 10% of the hours of [attorney]

---

counsel . . . testified that his fees for the defense of the case totaled $460,087.00, and approximately forty percent of these fees were directly related to Saratoga's antitrust claims.")).

[33] Perry requested a multiplier of three times the lodestar amount, which the trial court denied. *See City of Houston v. Levingston*, 221 S.W.3d 204, 237 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("After calculating the lodestar amount, a trial court can adjust the lodestar amount upward to account for the well-established *Johnson* factors.") (citing *Johnson v. Ga. Highway Exp., Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)).

time spent in this case . . . .[34]

In their response to the motion, appellants complained that Perry was required to further "segregate his damages attributable to the governmental entity from those attributable to the individual defendants." In reply, Perry submitted another affidavit from Reed reducing the attorneys' fees by another ten percent, five percent as to each claim, to segregate the fees as between the whistleblower and section 1983 claims (First and Fourteenth Amendments).

Reed attested:

> In my opinion, the basic underlying conduct related to the Texas Whistleblower claim and the First Amendment claim is the same or substantially the same (the reporting of illegal conduct to the Harris County District Attorney's Office ("HCDA")). As a consequence, AISD is receiving the appropriate [*Chapa*] reduction.
>
> . . . .
>
> [I]n my opinion, the attorneys' fees attributable to each of Plaintiff's three causes of action [whistleblower and First and Fourteenth Amendments] should be reduced by an additional five (5) percent for each claim that a Defendant is not liable. The five (5) percent reduction with regard to each of the claims is to address the legal aspects and characteristics of research and specific legal analysis that would be attributable only to either the whistleblower claim, and/or the First and Fourteenth Amendment claims.
>
> . . . .
>
> The result of such reduction is as follows:
>
> - AISD - reduction of another ten (10) percent, added to the original ten (10) percent reduction (5%, related to the First Amendment claim and 5% related to the Fourteenth Amendment claim [only

[34] Reed also attested that Perry's previous attorney incurred approximately $40,000 in attorney's fees for work related to "early grievances and in preparing and filing the Original Petition." Perry did not seek to recover any portion of those fees.

being sought as an alternative claim]); and

- Turner and Bonaparte reduction of another ten (10) percent, added to the original ten (10) percent (5% related to the Texas Whistleblower claim and 5% related to the Fourteenth Amendment claim [only being sought as an alternative claim]).

Accordingly, Perry attributed approximately 80% of his attorneys' fees to each claim to each appellant for which fees were recoverable. After the additional discount and segregation of fees, the total amount of attorneys' fees sought before a multiplier was $468,445.[35] We conclude Perry presented evidence of how he segregated fees as to liability for each claim by each party. We hold that the evidence supports a conclusion that Perry properly and adequately segregated attorneys' fees as between his whistleblower and section 1983 claims under the standard enunciated in *Chapa*. *See* 212 S.W.3d at 314 & n.83; *see also Citizens Nat'l Bank*, 387 S.W.3d at 88.

We overrule appellants' ninth issue.

### ***Conclusion***

We overrule appellants' six issues challenging the judgment against them on Perry's whistleblower and First Amendment claims. We do not reach appellants' issues involving the alternative judgment in favor of Perry on his Fourteenth Amendment claim. We affirm the judgment of the trial court.

/s/ Martha Hill Jamison
Justice

Panel consists of Justices Christopher, Jamison, and Donovan.

[35] Reed did not testify at the hearing on the motion for attorneys' fees, but the trial court gave appellants an opportunity to cross-examine him. Appellants declined.